IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

JAMES DOTSON, §
    Plaintiff, §
§
v. § CIVIL ACTION NO. H-05-0106
§
CERES GULF, §
    Defendant. §

## MEMORANDUM AND ORDER

This employment discrimination and retaliation case is before the Court on the

Motion for Summary Judgment [Doc. # 15] ("Motion") filed by Defendant Ceres Gulf

("Ceres"), to which Plaintiff James Dotson ("Dotson") filed his response in opposition

[Doc. # 18] and Ceres filed a reply [Doc. # 19].  Based on a careful review of the full

record in this case and the governing legal authorities, the Court concludes that Ceres'

motion should be **granted**.

## I.    BACKGROUND

Ceres, along with many of the stevedoring companies on the Texas Gulf Coast,

is a party to a multiemployer collective bargaining agreement with the International

Longshoremen's Association ("ILA").   The West Gulf Maritime Association

("WGMA") represents these employers in negotiating and administering the multiemployer collective bargaining agreement ("CBA").

Dotson is an African-American male.  Dotson, as a member of ILA Local #24 (the "Local"), has worked as a truck driver, gang foreman, walking foreman, and gang member.   In addition to Ceres, Dotson worked for various WGMA-member stevedoring companies.

To obtain workers each day, Ceres and other WGMA members provide the Local a list of work assignments.  The Local posts daily the available work assignments on a board in the hiring hall.  Seniority determines the order in which workers are offered each job assignment.  If a worker is not available, does not accept an assignment, or is barred from working for a particular company, the next available most senior worker is given the job opportunity.  If a worker is barred from one company, he still is eligible for jobs with different companies.  Once a worker is referred to a company by the Local and arrives dockside, the worker becomes that company's employee.  If a person is "fired" from a job at one company on a particular day, generally, the worker may return to that company as soon as the next day.  Also, if "fired" from one company, the worker nevertheless qualifies for assignments from another WGMA company.

Employer complaints against ILA workers are handled by the Joint Productivity Review Committee ("JPRC"). The JPRC is a body established under the CBA and consists of employer and union representatives. The union and employer group have an equal number of votes on the JPRC. The CBA authorizes the JPRC to hold hearings and issue decisions on disputes relating to a worker's qualifications, efficiency, or discipline.

Dotson filed a race discrimination complaint with the Equal Employment Opportunity Commission ("EEOC") on September 15, 2004. On October 21, 2004, the EEOC issued Dotson a right to sue letter. Dotson filed this suit on January 12, 2005. Specifically, Dotson contends he was subjected to disparate treatment, harassed, and constructively discharged because of his race in violation of Title VII and 42 U.S.C. § 1981.[1] Dotson also alleges that Ceres retaliated against him in violation of Title VII by harassing and constructively discharging him after he complained of racial

---

[1]     Plaintiff's Original Petition ("Petition"), ¶¶ 25–35. It is not clear from the Petition whether Dotson has brought any claims under § 1981 besides constructive discharge. *See id.*, ¶¶ 32–33 (Dotson alleges Ceres "violated Plaintiff's civil rights in violation of 42 U.S.C. [§] 1981, by intentionally interfering with Plaintiff's performance because of his race. This intentional interference consisted of discrimination of a continuous nature until Plaintiff was constructively terminated."). For purposes of this Memorandum and Order, however, the Court assumes Dotson asserts his disparate treatment, hostile work environment, and constructive discharge claims under both Title VII and § 1981.

discrimination.[2]  The facts specific to Dotson's respective claims will be set forth fully

as necessary for the analysis in this Memorandum and Order.

## II.   <u>SUMMARY JUDGMENT STANDARD</u>

Rule 56 of the Federal Rules of Civil Procedure mandates the entry of summary

judgment, after adequate time for discovery and upon motion, against a party who fails

to make a sufficient showing of the existence of an element essential to the party's

case, and on which that party will bear the burden at trial.  *Celotex Corp. v. Catrett*,

477 U.S. 317, 322 (1986);  *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir.

1994) (en banc); *see also Baton Rouge Oil and Chem. Workers Union v. ExxonMobil

Corp.,* 289 F.3d 373, 375 (5th Cir. 2002).

In deciding a motion for summary judgment, the Court must determine whether

"the pleadings, depositions, answers to interrogatories, and admissions on file, together

with any affidavits filed in support of the motion, show that there is no genuine issue

as to any material fact and that the moving party is entitled to judgment as a matter of

law." FED. R. CIV. P. 56(c); *Celotex Corp.*, 477 U.S. at 322–23; *Hart v. Hairston*, 343

F.3d 762, 764 (5th Cir. 2003).  An issue is material if its resolution could affect the

outcome of the action.  *Terrebonne Parish Sch. Bd. v. Columbia Gulf Transmission

Co.,* 290 F.3d 303, 310 (5th Cir. 2002) (citing *Anderson v. Liberty Lobby, Inc.,* 477

---

[2]      Dotson has not alleged a retaliation claim under § 1981.  *See id.*, ¶¶ 37–40.

U.S. 242, 248 (1986)).  In deciding whether a fact issue has been created, the facts and the inferences to be drawn from them must be reviewed in the light most favorable to the nonmoving party.  *Reaves Brokerage Co. v. Sunbelt Fruit & Vegetable Co.*, 336 F.3d 410, 412 (5th Cir. 2003).  However, factual controversies are resolved in favor of the nonmovant "only when there is an actual controversy—that is, when both parties have submitted evidence of contradictory facts." *Olabisiomotosho v. City of Houston,* 185 F.3d 521, 525 (5th Cir. 1999).

The party moving for summary judgment has the initial burden of demonstrating the absence of a material fact issue with respect to those issues on which the movant bears the burden of proof at trial.  *Smith  v. Brenoettsy*, 158 F.3d 908, 911 (5th Cir. 1998).  The movant meets this initial burden by showing that the "evidence in the record would not permit the nonmovant to carry its burden of proof at trial." *Id.*[3]  If the movant meets this burden, the nonmovant must go beyond the pleadings and designate

---

[3]     "When a party moves for summary judgment, . . . '[i]t is not enough for the moving party to merely make a conclusory statement that the other party has no evidence to prove his case.'" *St. Paul Mercury Ins. Co. v. Williamson,* 224 F.3d 425, 440 (5th Cir. 2000) (citing *Ashe v. Corley,* 992 F.2d 540, 543 (5th Cir.1993)).  "[B]efore the non-moving party is required to produce evidence in opposition to the motion, the moving party must first satisfy its obligation of demonstrating that there are no factual issues warranting trial." *Id.* (internal quotations and citations omitted).  "Indeed, where a motion for summary judgment is solely based on the pleadings or only challenges the sufficiency of the plaintiff's pleadings, then such a motion should be evaluated in much the same way as a Rule 12(b)(6) motion to dismiss." *Id.* (citation omitted).

specific facts showing that there is a genuine issue for trial. *Littlefield v. Forney Indep. Sch. Dist.*, 268 F.3d 275, 282 (5th Cir. 2001) (quoting *Tubacex, Inc. v. M/V Risan*, 45 F.3d 951, 954 (5th Cir. 1998)).   A dispute over a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id*. (quoting *Brenoettsky*, 158 F.3d at 911); *see also Quorum Health Resources, L.L.C. v. Maverick County Hosp. District*, 308 F.3d 451, 458 (5th Cir. 2002).

The nonmovant's burden is not met by mere reliance on the allegations or denials in the nonmovant's pleadings.  *See Diamond Offshore Co. v. A&B Builders, Inc.*, 302 F.3d 531, 545 n.13 (5th Cir. 2002) (noting that unsworn pleadings do not constitute proper summary judgment evidence (quoting *Johnston v. City of Houston*, 14 F.3d 1056, 1060 (5th Cir. 1994))).  Likewise, "unsubstantiated or conclusory assertions that a fact issue exists" do not meet this burden. *Morris v. Covan World Wide Moving, Inc.*,  144 F.3d 377, 380 (5th Cir. 1998).  Instead, the nonmoving party must present specific facts which show "the existence of a 'genuine' issue concerning every essential component of its case." *Id*.  In the absence of any proof, the court will not assume that the nonmovant could or would prove the necessary facts. *Little*, 37 F.3d at 1075 (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)).

Finally, "[w]hen evidence exists in the summary judgment record but the nonmovant fails even to refer to it in the response to the motion for summary judgment,

that evidence is not properly before the district court." *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003) (citing *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998); *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 916 (5th Cir. 1992)). "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *See id.* (internal citations and quotations omitted).

## III.   DISCRIMINATION CLAIMS

Dotson claims that Ceres discriminated against him in a number of ways. Specifically, Dotson claims that Ceres (1) subjected him to disparate treatment; (2) created a hostile work environment; and (3) constructively discharged him from employment.

### A.    General Standards for Discrimination Claims

Title VII prohibits employers from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."[4]   42 U.S.C. § 2000e–2(a)(1).  The plaintiff's burden can be met through direct evidence, statistical

---

[4]    Claims of employment discrimination brought under § 1981 are governed by the same substantive legal standards and evidentiary framework applicable to claims brought under Title VII. *See, e.g., Jones v. Robinson Prop. Group, L.P.*, 427 F.3d 987, 992 (5th Cir. 2005); *Felton v. Polles*, 315 F.3d 470, 486 (5th Cir. 2002).  Because the same evidentiary burdens apply, a claim that fails on the merits under Title VII, likewise, fails under § 1981.

evidence, or by establishing a *prima facie* case with circumstantial evidence, as set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Urbano v. Cont'l Airlines*, 138 F.3d 204, 206 (5th Cir. 1998).

"Absent direct evidence of discriminatory intent, as is typically the case, proof via circumstantial evidence is assembled using the framework set forth in the seminal case of *McDonnell Douglas Corp. v. Green*." *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 222 (5th Cir. 2000); *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142– 43 (2000); *Laxton v. Gap, Inc.*, 333 F.3d 572, 578 (5th Cir. 2003). "Direct evidence is evidence that, if believed, proves the fact of discriminatory animus without inference or presumption." *West v. Nabors Drilling USA, Inc.*, 330 F.3d 379, 384 n.3 (5th Cir. 2003) (internal citations and quotations omitted).[5] Where there is no direct evidence of discrimination, the plaintiff must initially establish a *prima facie* case by satisfying a multi-factor test from which a discriminatory motive may be inferred, thus creating a rebuttable presumption of intentional discrimination. *See Russell*, 235 F.3d at 222.

Once the plaintiff establishes a *prima facie* case, the burden then shifts to the defendant to articulate—but not prove—a legitimate, nondiscriminatory reason for its employment decision. *See Reeves*, 530 U.S. at 142. "This burden is one of production,

---

[5]     Dotson has not maintained there is direct evidence of discrimination.

not persuasion; it 'can involve no credibility assessment.'" *Id.* (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993)). "The [employer] must clearly set forth, through the introduction of admissible evidence, reasons for its actions which, '*if believed by the trier of fact*,' would support a finding that unlawful discrimination was not the cause of the employment action." *Bauer v. Albemarle Corp.*, 169 F.3d 962, 966 (5th Cir. 1999) (quoting *Hicks*, 509 U.S. at 507) (emphasis in original).

If the employer satisfies its burden of production, the presumption disappears, and the trier of fact proceeds to determine the ultimate issue: whether the plaintiff has proved that the defendant intentionally discriminated against the plaintiff. *See id.* (citing *Hicks*, 509 U.S. at 507). Even though the evidentiary burdens shift back and forth under this rubric, the plaintiff retains the burden of ultimately persuading the fact trier that the defendant intentionally discriminated against the plaintiff. *Laxton*, 333 F.3d at 578.

In attempting to satisfy this burden, under the modified *McDonnell Douglas* approach, the plaintiff must "offer sufficient evidence to create a genuine issue of material fact either (1) that the defendant's reason is not true, but is instead a pretext for discrimination (pretext alternative); or (2) that the defendant's reason, while true, is only one of the reasons for its conduct, and another motivating factor is the plaintiff's protected characteristic (mixed-motives alternative)." *Rachid v. Jack In The Box*, 376

F.3d 305, 312 (5th Cir. 2004) (internal citations and quotations omitted).  If the plaintiff demonstrates that race was a motivating factor in the employment decision, the defendant must then prove that "the same adverse employment decision would have been made regardless of discriminatory animus."  *Id*.  The plaintiff will prevail if the employer fails to carry this burden.  *Id*.

Under the pretext alternative approach, the "plaintiff may establish pretext either through evidence of disparate treatment or by showing that the employer's proffered explanation is false or 'unworthy of credence.'"  *Laxton*, 333 F.3d at 578 (quoting *Reeves*, 530 U.S. at 143; *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 220 (5th Cir. 2001)).  "An explanation is false or unworthy of credence if it is not the real reason for the adverse employment action."  *Id*. (citing *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 899 (5th Cir. 2002)).  "Evidence demonstrating that the employer's explanation is false or unworthy of credence, taken together with the plaintiff's *prima facie* case, is likely to support an inference of discrimination without further evidence of defendant's true motive."  *Id*. (citing *Sandstad*, 309 F.3d at 897).  "[O]nce the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision."  *Reeves*, 530 U.S. at 147.

Ultimately, "[w]hether summary judgment is appropriate depends on numerous factors, including 'the strength of the plaintiff's *prima facie* case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case that properly may be considered' by a court when ruling on a motion for summary judgment." *Price v. Fed. Express Corp.*, 283 F.3d 715, 720 (5th Cir. 2002) (quoting *Reeves*, 530 U.S. at 148–49).

The Fifth Circuit has noted that a "plaintiff's conclusory assertions of less favorable treatment, absent specific examples, were insufficient to establish discrimination." *Wallace*, 271 F.3d at 225 (citing *Swanson v. Gen. Servs. Admin.*, 110 F.3d 1180, 1186 (5th Cir. 1997)). Further, a plaintiff's vague or conclusory allegations of discrimination or harassment are insufficient to survive summary judgment. *Huckabay v. Moore*, 142 F.3d 233, 241 (5th Cir. 1998) (internal citation omitted).

In Texas, a plaintiff must file a charge of discrimination with the EEOC within 300 days after the unlawful employment practice occurred in order to preserve a Title VII claim. 42 U.S.C. § 2000e–5(e)(1). Section 1981 employment discrimination claims that are based on conduct occurring after and apart from the formation of a contract have a four-year statute of limitations. *See Jones v. R.R. Donnelly & Sons*

*Co.*, 541 U.S. 369, 382–83 (2004); *Johnson v. Crown Enterprises, Inc.*, 398 F.3d 339, 341 (5th Cir. 2005).[6]

### B.   Disparate Treatment Claim

Dotson alleges that he was subjected to disparate treatment discrimination while working for Ceres. Ceres contends Dotson's disparate treatment claims fail on grounds that they are time-barred and/or Dotson cannot establish a *prima facie* case of disparate treatment because Dotson has not identified any similarly situated Caucasian employees who were treated more favorably.  Alternatively, Ceres contends summary judgment is appropriate because it has articulated legitimate nondiscriminatory reasons for Dotson's termination, and Dotson has not presented evidence that Ceres' reasons are pretext.  Dotson disputes many of Ceres' assertions and argues that genuine issues of material fact concerning the *prima facie* case and proof of pretext exist.

To establish a *prima facie* case of disparate treatment, Dotson must present evidence that (1) he belongs to a protected class; (2) he is qualified for the position; (3) he suffered an adverse employment action; and (4) others outside the class who were similarly situated were treated more favorably than he.[7]  *See Abarca v. Metro. Transit*

---

[6]      Given Dotson's theories, the Court uses the four-year limitations period.

[7]      In its Motion, Ceres does not contest that Dotson was a member of a protected class (African-American).  Nor does Ceres claim that Dotson was unqualified for his position.

*Auth.*, 404 F.3d 938, 941 (5th Cir. 2005) (citing *Rios v. Rossotti*, 252 F.3d 375, 378

(5th Cir. 2001)).  Dotson has complained of multiple instances of disparate treatment.

The Court addresses each incident in turn.

### (1)     Lunch Break Incident

In 1998, when Dotson left early for his lunch break, he was reprimanded by

management.  Specifically, Ceres supervisor John Tollefsen ("Tollefsen"), a Caucasian,

told Dotson in response to his leaving early, "You niggers just don't want to do right."[8]

Dotson was fired from the job for the remainder of the day.  Tollefsen and Ceres did

not pursue any further action.  Ceres permitted Dotson to return to work the following

day.

Ceres argues that all claims, such as this lunch incident, based on events

occurring before November 19, 2003, are time-barred.  Dotson filed a charge of

discrimination with the EEOC on September 14, 2004.  Under 42 U.S.C. §

2000e-5(e)(1), claimants in Texas must file a charge of discrimination with the EEOC

within 300 days after the alleged unlawful employment practice occurred.  *Huckabay*,

142 F.3d at 238.  Therefore, under Title VII, any claims based on acts before

November 19, 2003, are time-barred, absent an equitable exception to the limitations

---

[8]     Excerpts from the Deposition of James Dotson ("Dotson Deposition"), attached as unmarked
        Exhibit to Motion, at 56.

period.  *See id.*  This 1998 incident also is outside the four-year limitations period

applicable to this claim if asserted under § 1981.  *See Crown Enterprises*, 398 F.3d at

341.

Dotson argues that he is entitled to recover for his otherwise untimely disparate

treatment claims under a continuing violation theory.  The Court disagrees.  In contrast

to a claim alleging a hostile work environment, the continuing violation doctrine does

not apply to a claim based on discrete discriminatory acts such as disparate discipline,

dismissals, demotions, failure to hire, or failure to promote.  *See Pegram,* 361 F.3d at

279; *Celestine v. Petroleos de Venezuella, S.A.*, 266 F.3d 343, 352 (5th Cir. 2001)

("[D]iscrete adverse actions, although racially motivated, cannot be lumped together

with the day-to-day pattern of racial harassment and therefore, if otherwise untimely,

cannot be saved by the continuing violation doctrine") (internal citations and quotations

omitted).  This incident is therefore time-barred under both Title VII and § 1981 and

cannot support Dotson's disparate treatment claim.

### (2)    Parking Incident

On August 5, 2003, Dotson attempted to park his truck at Ceres' facility.

Dotson explains that he observed that most of the parking spots were occupied.

Dotson was off the clock, so he proceeded to park the truck next to a fence.  Dotson

claims he parked near the fence instead of a remote parking spot in an effort to respect

management's wishes that workers not work off the clock.  Jim Osterman, a Caucasian

Ceres mechanic, berated Dotson for the parking spot selection.  Dotson claims, without

providing specifics, that he personally had observed Caucasian drivers park their trucks

along the fence while they ate lunch and these drivers were never confronted or berated

about such.  Dotson moved the truck, while off the clock, as demanded by Osterman.

Ceres supervisor John Halligan ("Halligan") submitted a complaint to the

WGMA requesting that Dotson not be referred to Ceres as a truck driver again.

Halligan's complaint contained an account of the circumstances distinctly different

from Dotson's:

> Dotson was told to park his truck against the fence.  He told our
> mechanic, Jim Osterman, that he was not paid to park trucks.  Dotson left
> his truck in the middle of the aisle and exited the terminal.  This action
> caused difficulty to the other gang drivers when they parked their trucks.[9]

The JPRC met on August 20, 2003, to consider Halligan's complaint.  Jim

Osterman, Halligan, and Tollefsen attended on behalf of Ceres.  ILA official Jerry

Hibbler attended on Dotson's behalf.  Tollefsen presented his account of prior negative

incidents concerning Dotson at Ceres.  The parties could not reach a compromise.  The

JPRC's bipartisan council determined that Dotson would be placed on "non-referral"

---

[9]        WGMA Complaint Form dated August 5, 2003, Dotson Deposition Exhibit 12.

status with Ceres for six months.[10]  Dotson also was placed on "probationary" status

for six months with all WGMA employers.  Any work-rule violations were to result in

Dotson being decertified as a truck driver.[11]

Pursuant to Dotson's request, the JPRC revisited its decision on September 23,

2003.  The JPRC issued a new decision that indicates that Dotson apologized to the

JPRC and to Ceres for his behavior and agreed to improve.[12]  The JPRC reduced

Dotson's non-referral status to sixty days.  Ceres indicated that it did not oppose

dropping the non-referral status if Dotson had no incidents during the sixty days and

exhibited an improved attitude.  Dotson concedes that he has no reason to

---

[10]     The record establishes that the decisionmaker on all discipline is a third party *other than* Ceres.  However, the record does not reveal how the JPRC constitutes its panels to make decisions on any particular complaint filed by an employer or worker.  The Court consequently does not decide this case based on a ruling that Ceres is not the decisionmaker, although it appears that issue could be dispositive in defeating Dotson's disparate discipline claims.  The Court notes that when a supervisor shown to possess discriminatory animus is not the final decisionmaker, a plaintiff can demonstrate that the supervisor's discriminatory animus nevertheless caused the adverse employment action *if* the plaintiff can show that the supervisor had influence or leverage over the official decisionmaker.  *See Roberson v. Alltel Info. Servs.*, 373 F.3d 647, 653 (5th Cir. 2004) (citing *Russell,* 235 F.3d at 226).  There has been no such showing of influence or leverage here.

Further undercutting the viability of Dotson's claims is the fact that he ultimately agreed to a compromised punishment for this parking incident and the crane incident (discussed below).  Because Ceres did not advance these theories, and the record is not complete in this regard, the Court will address the parties' arguments as briefed.

[11]     JPRC Decision dated August 20, 2003, Dotson Deposition Exhibit 13.

[12]     JPRC Decision dated September 23, 2003, Dotson Deposition Exhibit 14.

believe—other than his personal belief that he was subjected to disparate treatment—that Ceres' complaint was motivated by racial animus.[13]

Dotson's disparate treatment claim based on the parking incident also is time barred under Title VII.  *See* 42 U.S.C. § 2000e-5(e)(1); *Huckabay,* 142 F.3d at 238. As noted above, this incident occurred before November 19, 2003.  This claim cannot support Dotson's Title VII cause of action for disparate treatment.  However, this claim is not time-barred under § 1981's four-year statute of limitations.  *See Crown Enterprises*, 398 F.3d at 341.   The Court thus considers whether Dotson has established a *prima facie* case of disparate treatment with respect to the parking incident.

To establish disparate treatment, Dotson must produce evidence that he was treated differently from similarly situated co-workers of a different race.  For another employee to be "similarly situated," the employee's circumstances, including the conduct for which the plaintiff was discharged, must be "nearly identical."  *See Perez v. Texas Dept. of Crim. Justice*, 395 F.3d 206, 213 (5th Cir. 2004).  The "conduct at issue is not nearly identical when the difference between the plaintiff's conduct and that of those alleged to be similarly situated accounts for the difference in treatment received from the employer."  *Wallace*, 271 F.3d at 221.  In addition to nearly identical

---

[13]      Dotson Deposition, at 97.

conduct, the employees' circumstances must be nearly identical. *See Krystek v. Univ. of So. Miss.*, 164 F.3d 251, 257 (5th Cir. 1999) (non-tenure track professor is not similarly situated to a tenure track professor). The "nearly identical" standard, when applied at the *McDonnell Douglas* pretext stage is a stringent standard—employees with different responsibilities, different supervisors, different capabilities, different work rule violations, or different disciplinary records are not considered to be "nearly identical." *Okoye v. Univ. of Tex. Houston Health Sci. Ctr.*, 245 F.3d 507, 514–15 (5th Cir. 2001).

Dotson argues that Osterman treated Caucasian truck drivers more favorably. Specifically, Dotson claims he "personally observed his white counterparts park their trucks in the same spot to eat lunch [without being] confronted or berated about such."[14] The Court assumes for the purposes of this analysis that the incident occurred as Dotson claims, *i.e.*, that his truck was parked right next to the fence and not in the lane blocking other traffic. Dotson has failed to produce evidence of the necessary specificity to raise a genuine fact issue that he received disparate treatment as compared to Caucasian drivers for similar conduct. His evidence is conclusory and vague. Dotson does not identify any comparator truck drivers. He does not present

---

[14]     Response, at 4 (citing Dotson Deposition, at 95).

evidence the offending drivers were employed by Ceres.  He gives no date or time frame of allegedly similar actions by drivers to which he refers.

Furthermore, Dotson does not counter Ceres' position that he was insubordinate and thus fails to present evidence that Caucasian truck drivers were treated differently by Ceres in filing a complaint or by the JPRC in "nearly identical" circumstances. Ceres wrote up Dotson for insubordination and for not following instructions, not for improperly parking his truck.[15]   The joint union/employer adjudicator, the JPRC, considered Ceres' insubordination complaint in light of Dotson's prior disciplinary problems and determined that discipline was warranted.[16]  Dotson presents no evidence that the unidentified Caucasian drivers refused to follow instructions, were insubordinate, or otherwise engaged in misconduct.   Dotson does not have evidence—or even contend that—other truck drivers rudely responded to a Ceres superior's order to move his truck.

Further, it is undisputed that during years prior to the incident in issue, Ceres had disciplined Dotson, as had other WGMA-member companies, several times.[17]  There

---

[15]   WGMA Complaint Form dated August 5, 2003, Dotson Deposition Exhibit 12.

[16]   JPRC Decision dated August 20, 2003, Dotson Deposition Exhibit 13.

[17]   Ceres incidents included: WGMA Complaint Form dated August 4, 1998, Dotson Deposition Exhibit 4 (fired for leaving early); WGMA Complaint Form dated December 2, 2002, Dotson Deposition Exhibit 6 (written up for carelessness and incompetence).  Dotson was also
(continued...)

is no evidence that any person to whom Dotson compares himself had a similar record of disciplinary problems. *See Okoye*, 245 F.3d at 514–15; *Wallace*, 271 F.3d at 221 (The "conduct at issue is not nearly identical when the difference between the plaintiff's conduct and that of those alleged to be similarly situated accounts for the difference in treatment received from the employer."). Dotson has thus failed to establish a *prima facie* case of discrimination with respect to the parking incident.

### (3)   Crane Incident

On November 7, 2003, Dotson was driving a truck at a Ceres facility. A Ceres clerk instructed Dotson and another driver (who was Caucasian) to proceed to a back area. Dotson followed the other driver. As Dotson proceeded, he wound up between two Ceres work gangs. The only way to reach the back track was to travel between two cranes. The crane is pyramid shaped and moves back and forth on a fixed set of tracks to move boxes between ships and trucks. The crane operator sits in the crane

---

[17]      (...continued)
written up by other WGMA-member companies. These complaints are relevant because WGMA representatives were on the JPRC council that ultimately determined Dotson's punishment. *See* WGMA Complaint Form dated July 11, 1991, Dotson Deposition Exhibit 2 (Dotson fired and not to be referred back to James Flanagan for insubordination); WGMA Complaint Form dated March 27, 2001, Dotson Deposition Exhibit 5 (fired from Universal Maritime for causing $14,572 in property damage); WGMA Complaint Form dated December 9, 2002, Dotson Deposition Exhibit 7 (written up at Universal Maritime for an accident causing property damages); WGMA Complaint Form dated March 3, 2003, Dotson Deposition Exhibit 11 (fired from United Maritime for falling asleep in truck on the line several times and failing to follow instructions).

fifty to sixty feet in the air.  The crane operator has difficulty seeing the trucks on the docks and objects on the tracks, although he may be able to see some of them if he looks down. The truck Dotson followed passed between the cranes without incident. As Dotson proceeded, traffic in front of him forced him to stop.  At that time, there was no walking foreman present or in sight to instruct the crane operator on how to handle the truck traffic.   The crane operator did not see Dotson's truck on the tracks and the crane struck Dotson's truck.  The accident cost Ceres more than $40,000.

Company policy prohibits trucks from parking on tracks in front of a crane because a crane operator has difficulty seeing objects on the tracks.  Dotson admitted that it is against company policy to park a truck in the crane's track.[18]

In a Port of Houston Police Department Incident Report, a witness confirmed that Dotson's truck was parked on the tracks between two cranes and that the crane struck Dotson's truck.  The report also notes that the crane operator indicated that he did not see Dotson's truck on the tracks.[19]

Halligan submitted a complaint to the WGMA requesting that Dotson not be referred to Ceres again.  Halligan stated:

---

[18]     Dotson Deposition, at 108.

[19]     Incident Report dated November 7, 2003, Dotson Deposition Exhibit 23.

Dotson attempted to exit lanes by passing between (2) cranes.  One crane was moving west and hit the rear of his bucket.  The collision knocked off a gantry motor and damaged the bucket.  (2) gangs stood by for 45 minutes.[20]

ILA members involved in workplace accidents are required to take a drug test.[21] Immediately after the collision, Ceres required Dotson to leave the premises and take a drug test.  Dotson passed the drug test and was paid for the time he spent taking the test.  The crane operator was not required to be tested and was not disciplined.

The JPRC met on November 26, 2003, to consider Halligan's complaint.[22] Tollefsen attended for Ceres.  ILA officials Jerry Hibbler and Tommy Isabell attended the meeting on Dotson's behalf.  The JPRC decided to defer a decision because no there was no Ceres representative in attendance with first-hand knowledge of the incident.  Tollefsen requested that Dotson be placed on non-referral status for six months.  Halligan requested permanent non-referral status.

The JPRC reconvened on January 7, 2004.  Tollefsen attended the meeting for Ceres.  The JPRC's decision found that Dotson "admitted that in the past, he had performed his jobs a 'little out of the norm' and that his attitude and actions weren't as

---

[20]     WGMA Complaint Form dated November 7, 2003, Dotson Deposition Exhibit 15.

[21]     Affidavit of Johnny Lewis ("Lewis Affidavit"), Exhibit C to Response, ¶ 7.

[22]     JPRC Decision dated November 26, 2003, Dotson Deposition Exhibit 16.

good as they should have been."[23]  The JPRC noted also that Dotson acknowledged that the crane operator probably could not see his truck.  Dotson urged that he was not at fault in the accident and the fact that a Ceres clerk directed his path relieved him of responsibility.  Dotson also maintained that someone with a radio should have alerted the crane operator of the location of Dotson's truck.

Ceres wanted Dotson put on at least six months non-referral status for all jobs (at Ceres).  The parties nevertheless reached a compromise, avoiding a vote by the JPRC.  Dotson was placed on non-referral status as a truck driver at Ceres for six months.  During this period, Dotson was authorized to work as a truck driver for other WGMA employers.  He also was permitted to work at Ceres in non-driver capacities.

Dotson first claims with respect to the crane incident that he suffered actionable disparate treatment based on his race because he was subjected to a drug test, while the crane operator was not.  Ceres counters correctly that subjecting an employee to a drug test is not an adverse employment action.[24]  The Fifth Circuit holds that "an employment action that 'does not affect job duties, compensation, or benefits' is not an adverse employment action."  *Pegram*, 361 F.3d at 282 (quoting *Banks v. East Baton Rouge Parish Sch. Bd.*, 320 F.3d 570, 575 (5th Cir. 2003)).  Instead, "an

---

[23]     JPRC Decision dated January 7, 2004, Dotson Deposition Exhibit 17.

[24]     Notably, Dotson did not respond to this argument.

adverse employment action consists 'of *ultimate employment decisions* such as hiring, granting leave, discharging, promoting, and compensating.'" *Id.* (quoting *Felton*, 315 F.3d at 486).

A drug test does not fall within the scope or definition of an adverse employment action as defined by existing precedent. *See Pegram*, 361 F.3d at 282; *Felton*, 315 F.3d at 486–87. Since he was paid for time spent taking the test, the drug test did not affect Dotson's pay, benefits, or compensation in any way. Dotson passed the test, and therefore his employment status did not change; he was not suspended, demoted, discharged, transferred, denied a bonus, given another job with significantly fewer responsibilities, or refused a promotion as a result of the drug test. Ceres' imposition of the drug test therefore cannot form the basis for a disparate treatment race discrimination claim. *See Pegram*, 361 F.3d at 282.

Dotson also claims that being placed on non-referral status for six months was discriminatory disparate treatment. Dotson has failed, however, to present evidence that in this respect he was treated differently from similarly situated co-workers of a different race. As noted earlier, for another employee to be "similarly situated" to the plaintiff, the employee's circumstances, including the conduct for which the plaintiff was discharged, must be "nearly identical." *See Perez*, 395 F.3d at 213. The "conduct at issue is not nearly identical when the difference between the plaintiff's conduct and

that of those alleged to be similarly situated accounts for the difference in treatment received from the employer." *Wallace*, 271 F.3d at 221.  Further, the comparator employee's circumstances must be nearly identical to the plaintiff's circumstances in the incident under challenge. *See Krystek*, 164 F.3d at 257.  The "nearly identical" standard, when applied at the *McDonnell Douglas* pretext stage is a stringent standard—employees with different responsibilities, different supervisors, different capabilities, different work rule violations, or different disciplinary records are not considered to be "nearly identical." *Okoye*, 245 F.3d at 514–15.

Dotson has failed to present evidence that employees of different races were treated differently in "nearly identical" circumstances.  Dotson argues the crane operator was treated more favorably because he was not disciplined for his involvement in the crane incident.  Dotson admits, however, that he violated company policy by stopping his truck on the tracks.  He then speculates that the crane operator could have avoided the collision if he would have "looked down properly" at the tracks, although the operator was at least fifty feet off the ground.[25]  Dotson's evidence is insufficient and his argument is unpersuasive.  He presents no evidence that the crane operator violated any company policy.  Indeed, Dotson's own comments imply that fault lay with the absence of a walking foreman who should have alerted the crane operator that

---

[25]      Dotson Deposition, at 108.

a truck was on the track.[26]  Further, at the JPRC meeting on January 7, 2004, Dotson "stated that the crane operator was working above the vessel and probably could not see that his truck was sitting in the path of the truck as it gantried in position to unload the container."[27]

Dotson thus fails to show "that the misconduct for which" he was disciplined "was nearly identical" to the alleged misconduct of the crane operator.  *See Perez*, 395 F.3d at 213; *Wallace*, 271 F.3d at 221 (The "conduct at issue is not nearly identical when the difference between the plaintiff's conduct and that of those alleged to be similarly situated accounts for the difference in treatment received from the employer.").[28]  Dotson violated company policy by parking on the tracks.  There is no evidence the crane operator violated company policy.  Nor is there evidence that the crane operator otherwise engaged in any misconduct at all.

---

[26]      Dotson Deposition, at 106 ("The walking foreman, if he had been there and told the crane operator [that] a truck is on the track, to hold off, the accident would have never happened."); JPRC Decision dated January 7, 2004, Dotson Deposition Exhibit 17 ("Dotson believes that someone with radio contact should have alerted the crane operator that there was a truck sitting in the lane.").

[27]      JPRC Decision dated January 7, 2004, Dotson Deposition Exhibit 17.

[28]      Dotson conceded that he never has seen a crane hit a truck.  Dotson Deposition, at 110.

Further, Dotson had been disciplined by Ceres and other WGMA-member companies numerous times before the crane incident.[29]  Indeed, Dotson had only recently completed the probation for the parking incident.  There is no evidence that the crane operator had any similar disciplinary record.[30]  Accordingly, the Court finds that Dotson has not presented evidence that the crane operator was a "similarly situated" employee in "nearly identical" circumstances.  *See Okoye*, 245 F.3d at 514–15.

Finally, Dotson argues that several other Caucasian employees were involved in significant accidents, but were not disciplined.  Specifically, Dotson contends Tommy Isabell was involved with an accident that resulted in a fatality, but was not punished.[31]  Dotson has not identified which stevedoring company Isabell worked for when the accident happened, the decisionmaker, or whether or not Isabell was even arguably at fault.  The evidence pertaining to Isabell's circumstances are far too vague to be probative.  *See Huckabay*, 142 F.3d at 241 ("[V]ague or conclusory allegations of discrimination or harassment are not enough to survive summary judgment.").

Dotson also alludes to several other incidents of Caucasian workers allegedly causing property damage.  This evidence is not admissible because it is conclusory,

---

[29]     *See supra* note 17.

[30]     Operating a crane and driving a truck also involve different skills, responsibilities, and working conditions.

[31]     Dotson Deposition, at 115.

vague, and not shown to be relevant.[32]  Dotson has not demonstrated that employees

outside his protected class received preferential treatment in circumstances nearly

identical to his.  He therefore fails to establish a *prima facie* case of disparate treatment

based on the crane incident

Alternatively, assuming *arguendo* that Dotson could establish a *prima facie* case

of disparate treatment discrimination, the burden would shift to Ceres to provide a

legitimate, non-discriminatory reason for terminating Dotson's employment.  *See, e.g.,*

*Rachid*, 376 F.3d at 312.  Ceres states that it fired Dotson and requested he be put on

non-referral status because of his mistakes and insubordination that resulted in property

damage.  Poor work performance and insubordination are legitimate, nondiscriminatory

reasons for terminating an employee.  *See Perez v. Region 20 Educ. Serv. Ctr.*, 307

F.3d 318, 326 (5th Cir. 2002) ("Poor work performance is a legitimate,

---

[32]     Dotson submits that John Layman, a Caucasian crane operator, dropped a container in a
bayou and was not disciplined. Dotson claims this occurred sometime in 2003-04. However,
Dotson admitted that he did not know whether or not Ceres employed Layman, the identity
of the decisionmaker, whether Layman was at fault, or the outcome of the incident
investigation.  Dotson Deposition, at 170–172.  Dotson also claims he heard about an
unidentified Caucasian worker driving a Ceres truck hit and damaged four containers while
intoxicated.  Dotson claims this incident occurred during the five years preceding his
retirement, but admitted that he had no actual knowledge of the facts surrounding the incident
or the disciplinary outcome.  *Id.*, at 133–35.  Finally, Dotson claims he was told about a
Caucasian crane operator named "John" who caused a crane to collide with another crane
sometime in 2001-02.  Dotson could not identify the stevedoring company "John" worked
for, the disciplinary outcome, or whether or not there even was an investigation.  *Id.*, at
171–72.  These allegations are entirely too vague to support any of Dotson's discrimination
or retaliation claims.  *See Huckabay*, 142 F.3d at 241.

non-discriminatory reason for discharge."); *Chaney v. New Orleans Pub. Facility Mgmt., Inc.*, 179 F.3d 164, 167–68 (5th Cir. 1999) ("The failure of a subordinate to follow the direct order of a supervisor is a legitimate nondiscriminatory reason for discharging that employee.").  Therefore, Ceres easily satisfies its burden of production by stating a legitimate, non-discriminatory reason for Dotson's termination.  *See Rachid*, 376 F.3d at 312.  Dotson accordingly must establish a genuine issue of material fact by demonstrating either that Ceres' explanation is unworthy of credence or that a discriminatory reason actually motivated the adverse action.[33]  *See id.*

As evidence of pretext, Dotson questions why Ceres assigned blame to him when he was not at fault and did not fault the crane operator who "admitted he lost control."  Dotson has not produced evidence that the crane operator was at "fault" under company policies,[34] and thus Dotson has not shown Ceres' explanation to be false.  Ultimately, however, the outcome on pretext turns on whether or not Ceres held a good faith belief concerning Dotson's misconduct, not whether Dotson actually caused the collision.  The issue thus is whether Plaintiff has produced evidence that Ceres lacked a good faith belief of Dotson's misconduct when it advocated for his

---

[33]    Dotson only attempts to offer evidence of pretext, *i.e.*, Ceres' explanation is unworthy of belief.

[34]    The crane operator acknowledges he lost control after colliding with Dotson's truck, but never admitted fault in causing the collision.

discipline.  "The question is not whether an employer made an erroneous decision; it is whether the decision was made with discriminatory motive."  *Mayberry v. Vought Aircraft Co.*, 55 F.3d 1086, 1091 (5th Cir. 1995).  Stated differently, "the inquiry is limited to whether the employer believed the allegation in good faith and whether the decision to discharge the employee was based on that belief."  *Waggoner v. City of Garland*, 987 F.2d 1160, 1165-66 (5th Cir. 1993).

Dotson has presented no evidence that Ceres' articulated reason for its decision to terminate Dotson's employment was false and thus was a pretext for discrimination. There is no evidence that Ceres did not genuinely believe that Dotson engaged in the misconduct which formed the basis for the adverse employment action.  The Court concludes that Dotson has failed to meet his burden of proof to raise a genuine fact issue that Ceres' articulated non-discriminatory explanation for the adverse action resulting from the crane incident is pretext for discrimination.

Dotson thus has failed to present evidence to raise a genuine issue of material fact that he was subjected to disparate treatment based on his race with respect to any of the challenged disciplinary actions he suffered as a result of complaints by Ceres. Ceres is entitled to summary on all of Dotson's disparate treatment discrimination claims.

**C.**   **Hostile Work Environment (Harassment) Claim**

For reasons explained hereafter, no genuine material fact issues exist as to Dotson's hostile work environment or harassment claim.  Dotson has not established a *prima facie* case of harassment.

In support of this claim, Dotson cites to the following:[35]

(1)   Ceres discriminatorily advocated Dotson's discipline as a result of the treatment in 1998 and 2003-04, as discussed above;

(2)   Tollefsen referred to Dotson as a "nigger" once in 1998 (in the above-noted 1998 incident);

(3)   Tollefsen referred to Dotson as a "nigger" once in 2001;

(4)   Tollefsen was more cordial and friendly in dealing with Caucasian employees than he was with African-American employees; and

(5)   A Caucasian employee at another company, Sea Land, was permitted to secure a job for his son, but E.J. Richardson, an African-American, was chastised for securing his son's job.[36]

---

[35]   Ceres argues that several of Dotson's allegations of racial harassment are barred by limitations, and should not be considered by the Court.  Although Dotson has not presented evidence sufficient to support a continuing violation theory of racial harassment, the Court assumes he has met this burden and considers all the incidents he relies on for his harassment claim.

[36]   Dotson Deposition, at 166–67.

As discussed above, Dotson has not raised a genuine issue of material fact concerning any of the allegedly discriminatory incidents on which he relies for his disparate treatment discrimination claim. The evidentiary deficiencies regarding those incidents preclude those events from serving as probative evidence for Dotson's harassment claim. The remaining putative examples of hostile conduct, even when considered collectively and with the disparate treatment evidence, are insufficient to establish a *prima facie* case of a hostile work environment.

To establish a *prima facie* case of racial harassment by a supervisor, a plaintiff must show that (1) he belongs to a protected group; (2) he was subjected to unwelcome harassment; (3) the harassment plaintiff complains of was based on his race; and (4) the harassment affected a term, condition or privilege of employment. *See Celestine*, 266 F.3d at 353–54 (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998)). "For harassment to affect a 'term, condition, or privilege of employment' it must be 'sufficiently severe or pervasive so as to alter the conditions of employment and create an abusive working environment.'" *Id.* at 353 (quoting *Watts v. Kroger Co.*, 170 F.3d 505, 509 (5th Cir. 1999)).

In determining whether the alleged harassment affected a term, condition or privilege of employment, the Court considers the totality of the circumstances, including (1) the frequency of the discriminatory conduct; (2) the severity of the

challenged conduct; (3) whether the mistreatment was physically threatening or humiliating, or merely an offensive comment; and (4) whether the alleged harassment unreasonably interfered with the employee's work performance. *See Shepherd v. Comptroller of Public Accounts*, 168 F.3d 871, 874 (5th Cir. 1999).

Dotson has presented summary judgment evidence that Tollefsen, a supervisor at Ceres, referred to Dotson as a "nigger" once in 1998 and once in 2001.[37] Two incidents of a patently offensive slur, while rude and upsetting, are insufficient to affect the terms or condition of Dotson's employment. *See Moore v. United Parcel Serv., Inc.*, 150 Fed. Appx. 315, 319 (5th Cir. 2005) (holding that several racial slurs by supervisors was insufficient to create a hostile work environment); *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998) (A "mere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee would not sufficiently alter terms and conditions of employment to violate Title VII"); *see also Patel v. Midland Hosp. and Med. Ctr.*, 298 F.3d 333, 343–44 (5th Cir. 2002) (finding several racist

---

[37] Johnny Lewis, one of Dotson's coworkers, states in a general manner that he heard Tollefsen refer to African-Americans as "niggers." Lewis Affidavit, ¶ 4. Lewis did not state the date(s) or time frame of the alleged comments. Nor is it clear from the record whether Lewis merely is referencing either or both of Tollefsen's 1998 and 2001 statements to Dotson. Thus, Lewis' Affidavit is too vague to serve as admissible or probative evidence in the summary judgment analysis. On the other hand, viewing the evidence in the light most favorable to the nonmovant, the Court credits Dotson's testimony that Tollefsen referred to him as a "nigger" in 1998 and 2001.

comments made by decisionmakers two years before adverse action were insufficient to establish discrimination).[38]

Dotson also claims that Tollefsen was more cordial to Caucasian workers than African-American workers.[39]  Dotson does not cite any specific incidents to support this conclusion.  Dotson's vague and conclusory allegations of discrimination will not defeat summary judgment. *See Huckabay*, 142 F.3d at 241.  Furthermore, Dotson has not explained how Tollefsen's mannerisms affected a term or condition of his employment.

Finally, Dotson states that a Caucasian employee at Sea Land was permitted to secure a jobs for his son, but E.J. Richardson, an African-American, was chastised for doing the same.  Sea Land's employment decisions are irrelevant to Dotson's work environment at Ceres.

These alleged acts of harassment do not support a *prima facie* case of racial harassment under Title VII or § 1981.  Dotson relies on only a handful of specific incidents of alleged race-based harassment at Ceres in a career spanning twenty-six years.  The purported harassment is simply not sufficiently severe to affect a term,

---

[38]     Ceres argued that Dotson has not linked Dotson's "stray" comments to any adverse employment decision. Motion, at 22. Dotson did not respond to this argument. It is noted that both Dotson's 60-day and six-month non-referral discipline resulted from complaints filed by Halligan, not Tollefsen.

[39]     *See also* Lewis Affidavit, ¶ 5.

condition, or privilege of employment such as to "[destroy] a protected classmember's opportunity to succeed in the workplace." *See Hockman v. Westward Commc'ns, LLC*, 407 F.3d 317, 326 (5th Cir. 2004). Consequently, Dotson is unable to raise a genuine issue of material fact in support of the fourth prong of a *prima facie* case of hostile work environment, and summary judgment is warranted on this claim.

### D. Constructive Discharge Contention

Ceres also moved for summary judgment on Dotson's Title VII and § 1981 constructive discharge claim. Dotson retired in May 2004, several months after agreeing to be placed on six months non-referral status as a truck driver at Ceres. Dotson claims he was constructively discharged because years of race discrimination and harassment prompted his retirement.

The Fifth Circuit has articulated that a "constructive discharge claims can be regarded as an aggravated case of hostile work environment." *Vallecillo v. U.S. Dept. of Housing & Urban Dev.*, 2005 WL 3115080, at *3 (5th Cir. Nov. 22, 2005). A constructive discharge requires a greater degree of harassment than a hostile work environment claim. *Brown v. Kinney Shoe Corp.*, 237 F.3d 556, 566 (5th Cir. 2001) (citing *Benningfield v. City of Houston*, 157 F.3d 369, 378 (5th Cir. 1998)). Because Dotson cannot establish a hostile work environment claim, his constructive discharge claim fails *a fortiori*. *See Kinney Shoe*, 237 F.3d at 566; *see also Vallecillo*, 2005 WL

3115080, at *3 ("We agree with the district court's reasoning that because Appellant's hostile work environment claim has failed, his constructive discharge claim must also fail.").

## IV.   **TITLE VII RETALIATION CLAIM**

Dotson "asserts that he was retaliated against when he was suspended, taken off work as a disciplinary action, and constructively discharged" after he engaged in protected activities while working for Ceres.[40]  In its Motion, Ceres argues that there was no causal connection between the protected activity and the adverse employment actions because Ceres had no knowledge that Dotson engaged in a protected activity. The Court agrees and concludes that Dotson has failed to establish a *prima facie* of retaliation under Title VII.[41]

Title VII prohibits an employer from retaliating against employees who exercise their rights under the Act.  *See* 42 U.S.C. § 2000e–3(a).  "An employee has engaged in protected activity when he has (1) 'opposed any practice made an unlawful employment practice' by Title VII or (2) 'made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing' under Title VII."

---

[40]      Response, at 16–17.

[41]      Dotson brings his retaliation claim under Title VII.  *See* Plaintiff's Original Complaint, ¶ 38.

*Douglas DynMcDermott Petroleum Operations Co.*, 144 F.3d 364, 372 (5th Cir. 1998) (quoting 42 U.S.C. § 2000e-3(a)).

As with discrimination claims, the plaintiff's burden on a retaliation claim can be met through direct evidence or by satisfying the *McDonnell Douglas* circumstantial evidence test to establish a *prima facie* case. *See Mato v. Baldauf*, 267 F.3d 444, 452 (5th Cir. 2001). "The framework for analyzing a retaliation claim is the same as that used in the employment discrimination context." *Rios*, 252 F.3d at 380.

To establish a *prima facie* case of retaliation, Dotson must show (1) that he engaged in activity protected by Title VII; (2) that he suffered an adverse employment action; and (3) that there was a causal connection between the protected activity and the adverse employment action. *See Davis v. Dallas Area Rapid Transit*, 383 F.3d 309, 319 (5th Cir. 2004) (citing *Banks*, 320 F.3d 575). "If a plaintiff succeeds in making a *prima facie* case, the burden then shifts to the defendant to proffer a legitimate rationale for the underlying the [*sic*] employment action. If the defendant makes this showing, the burden shifts back to the plaintiff to demonstrate that the employer's articulated reason for the employment action was a pretext for retaliation." *Id.* (citing *Aldrup v. Caldera*, 274 F.3d 282, 286 (5th Cir. 2001)).

At the *prima facie* stage on a retaliation claim, "the standard for satisfying the causation element is 'much less stringent' than a 'but for' causation standard." *Fierros*

*v. Tex. Dept. of Health*, 274 F.3d 187, 191 (5th Cir. 2001) (quoting *Long v. Eastfield Coll.*, 88 F.3d 300, 305 n.4 (5th Cir. 1996)).  Nevertheless, the plaintiff must produce some evidence of a causal link between the protected activity and the adverse employment action to establish a *prima facie* case of retaliation.  *See id.*  "'If an employer is unaware of an employee's protected conduct at the time of the adverse employment action, the employer plainly could not have retaliated against the employee based on that conduct.'"  *Ackel v. Nat'l Commc'ns., Inc.*, 339 F.3d 376, 386 (5th Cir. 2003) (quoting *Chaney*, 179 F.3d at 168).[42]

Dotson asserts that he was retaliated against when he was disciplined by being suspended, given non-referral status as a truck driver at Ceres, and then constructively discharged after he engaged in the following protected activities:

(1)     In 1998, verbally complaining of race discrimination to ILA officials Jerry Hibbler and Jesse Rivas,[43]

---

[42]     *See also Medina v. Ramsey Steel Co.*, 238 F.3d 674, 684 (5th Cir. 2001) ("A causal link is established when the evidence demonstrates that the employer's decision to terminate was based in part on knowledge of the employee's protected activity.") (internal citation and quotations omitted); *Roberson v. Game Stop, Inc.*, 395 F. Supp. 2d 463, 472 (N.D. Tex. 2005) (holding employee failed to establish *prima facie* case of retaliation under Title VII through evidence that she was terminated six weeks after filing discrimination complaint; employee did not provide evidence that decisionmakers responsible for her termination were even aware of the complaint).

[43]     Response, at 16; *see also* Dotson Deposition, at 56–62.

(2)     "In September 2003, Mr. Dotson made it known that he believed that Defendant's agent, John Tollefsen, behaved in a racially discriminatory manner,"[44] and

(3)     Writing three letters (two to ILA officials and one to the United States Department of Labor) in March 2004 complaining of discrimination retaliation, and racism.

In its Motion, Ceres does not contest the first two elements of Dotson's *prima facie* retaliation case, *i.e.*, that Dotson engaged in protected activities or suffered an adverse action. Ceres instead maintains that there was no causal connection between the protected activity and the adverse employment actions because Ceres had no knowledge that Dotson engaged in any protected activity.[45]   In his Response, Dotson fails to direct the Court to any evidence that Ceres was aware of Dotson's verbal and written complaints of discrimination. Dotson instead directs the Court to evidence of Dotson's complaints to union officials and the Department of Labor.[46]

---

[44]     Response, at 17. Dotson has not cited to any summary judgment evidence referencing this activity. The Court is not obligated to sift through the record in search of evidence supporting Dotson's opposition to summary judgment. *See Malacara*, 353 F.3d at 405. The Court nonetheless has carefully reviewed the record and construes Dotson's argument to refer to complaints Dotson made to Local President Jerry Hibbler. *See* Dotson Deposition, at 95–99.

[45]     Motion, at 25–26; Reply, at 2.

[46]     Response, at 16–17.

Dotson has pointed to no evidence in the record, and the Court can find none, indicating that Ceres was aware that Dotson had engaged in any protected activity vis à vis Ceres.  Dotson's verbal complaints of discrimination were made in 1998 to Jerry Hibbler and Jesse Rivas, both of whom are union officials.  Dotson admits he did not complain directly to Ceres.  Dotson has adduced no evidence that the ILA ever filed a grievance or otherwise raised Dotson's complaints with Ceres.[47]  Dotson sent his March 2004 written letters to ILA officials and the Department of Labor, not to Ceres.[48]  There is no evidence either of these entities raised Dotson's complaints with Ceres.  In response to one of the letters, the ILA's regional President informed Dotson that the union would take no action on Dotson's behalf because Dotson had failed to provide any evidence that Ceres was discriminating against him.  In sum, there is no evidence that Ceres was aware of Dotson's verbal or written complaints before Dotson suffered an adverse action.   Because he is unable to establish a *prima facie* case due to the lack of a causal connection between the protected activity and the complained of adverse actions, Dotson's Title VII retaliation fails and summary judgment is proper on that claim.

---

[47]     Dotson Deposition, at 56–62.

[48]     Dotson sent these letters months *after* being placed on non-referral status for the parking incident and the crane incident.

## IV.   CONCLUSION AND ORDER

Dotson has failed to present evidence to raise a genuine issue of material fact in support of his claims for race discrimination, hostile work environment, constructive discharge, or retaliation.  As a result, Ceres is entitled to summary judgment dismissing this case.  It is therefore

**ORDERED** that Defendant Ceres Gulf's Motion for Summary Judgment [Doc. # 15] is **GRANTED**.  A final judgment will be entered in a separate order.

SIGNED at Houston, Texas, this **9th** day of **January 2006**.

Nancy F. Atlas
United States District Judge